UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| FARHAD ADULI, ET AL.<br>*Plaintiffs* | CIVIL ACTION<br>NO.: 23-2514 |
| VERSUS | SECTION: "D" (1) |
| J.M. SMUCKER COMPANY, ET AL.<br>*Defendants* | JUDGE WENDY B. VITTER |
| | MAGISTRATE JUDGE<br>JANIS VAN MEERVELD |

ORDER AND REASONS

This is a products liability action arising out of the death of the minor child M.A., allegedly as a result of eating peanut butter contaminated with salmonella. The Court took several issues raised by three motions to compel discovery under advisement following oral argument. The Court now rules that peanut roasting temperatures and processes are irrelevant to the claims and defenses in this case and are not discoverable. Similarly, inspection of the facility that manufactured the allegedly tainted peanut butter could not yield any relevant information and will not be allowed. The remaining issues raised by plaintiffs' Motion to Compel Various Discovery (Rec. Doc. 84) and Motion to Compel Inspection (Rec. Doc. 87) were addressed at oral argument and these motions have now been resolved. [1] The court will address the Motion to Compel Depositions (Rec. Doc. 111) at or following the forthcoming status conference.

---

[1] In these motions, plaintiffs sought the following:

1. **Production of all documents listed in Smucker's privilege log (except for three emails with outside counsel which they say should be produced for in camera review).** Subject to meet and confer requirements as ordered during the hearing.
2. **Removal of all redactions regarding the roasting temperature and process.** Resolved herein.
3. **An order striking Smucker's boilerplate objections and ordering amendment.** Subject to meet and confer requirements as ordered during the hearing.
4. **Production of five categories of documents: (a) product testing results from March 1, 2022, through April 31, 2023, (b) transmission of internal messages, (c) drafts and copes if the 463A Affidavit, (d) copies of the BRC Recall Verification Affidavit, (e) and copies of all responsive documents withheld.** Subject to production deadlines as ordered during the hearing.
5. **Removal of all confidentiality designations unless the documents are highly sensitive.** Subject to meet and confer requirements as ordered during the hearing.

Background

Plaintiffs in this action are Farhad and Cherie Aduli, parents of the deceased minor child, M.A. The child had a chromosomal abnormality that left her immunocompromised. She required total care, which her family was able to provide her through tutors, therapists, caregivers, customization of areas of their home, and a pool she could use safely. Despite her numerous physical disabilities, she learned to walk with leg braces, and despite being non-verbal, she was able to communicate, do math, and go to school. At the time of her death, M.A. was nine years old.

On May 5, 2022, Ms. Aduli purchased three 8-packs of "Jif To Go Creamy Peanut Butter" cups. On May 20, 2022, Jif[2] instituted a recall of peanut butter manufactured at its Lexington, Kentucky manufacturing facility from October 1, 2021, through May 20, 2022, including the three 8-packs purchased by Ms. Aduli (identified by lot number). The Adulis did not receive notice of the recall from Walmart, where they had purchased the peanut butter via an online delivery order.

On June 14, 2022, Ms. Aduli gave M.A. a peanut butter tortilla that had been made with the entirety of one of the peanut butter cups. According to the plaintiffs, M.A. was "not herself" the next morning. They allege that she became lethargic and began exhibiting symptoms of a stomach ailment, such as belly pain and vomiting. She may have had a low-grade fever. Later in the day on July 17, 2022, M.A. stopped eating and drinking her bottles. Her symptoms worsened, and on June 18, 2022, her belly became distended, she began having watery stool, and she moaned loudly in discomfort. Ms. Aduli took M.A. to the emergency room on June 19, 2022, when she became lethargic and had trouble lifting her head. There, M.A. was diagnosed with a perforated

6. **Inspection of the Lexington facility**. Resolved herein.

[2] J.M. Smucker Company and Smucker Foodservice, Inc. manufactured Jif peanut butter.

bowel, peritonitis, and sepsis. Her sepsis was too advanced for M.A. to be considered a surgical candidate for repair of the bowel perforation. M.A. died on June 21, 2022.

Plaintiffs allege the peanut butter eaten by M.A. was contaminated with salmonella originating in Jif's facility and that salmonella caused M.A.'s death. The actual peanut butter that M.A. consumed no longer exists: All peanut butter in the cup was consumed and the remaining cups in the package were thrown away upon notice (after M.A.'s death) of the recall and, say plaintiffs, in light of the recall's instruction to dispose of peanut butter in any listed lot numbers. It appears that M.A. was not tested for salmonella infection. According to counsel, at the time she presented at the hospital, she was already in sepsis. No autopsy was performed. Counsel explained at oral argument that they expect their expert to testify that radiographic and microbiological markers in the existing medical records are consistent with salmonella. Plaintiffs claim that her symptoms were consistent with salmonella and that she did not have similar symptoms earlier in her life. They add that Cherie—who also ate some of the peanut butter—experienced symptoms of gastrointestinal illness at the same time.

At this stage, plaintiffs rely on the recall and prior salmonella outbreaks to support their theory that the peanut butter at issue was contaminated with salmonella. Plaintiffs allege that in 2010, salmonella was detected at the Lexington facility where the peanut butter at issue was manufactured. They allege that in addition to this, documented environmental testing detected salmonella at numerous instances and locations in the facility going back to at least 2018.

In December 2021, Jif installed new air intake vents in the cooling chamber of one of its roasters. Jif identified a leak in the air intake vent in mid-February 2022, a breach that led to multiple instances of standing water that seeped into systems that came into contact with roasted peanuts. Repairs were performed on February 20, 2022, when sampling again detected salmonella

in finished peanut butter.[3] But Smucker did not initiate a recall or report the event to the FDA's Reportable Food Registry. According to plaintiffs, Smucker concealed the contamination.

The FDA received notice that individuals were getting sick from salmonella ingestion in May 2022. The FDA concluded that the source of the outbreak was Jif peanut butter produced at the Lexington facility. According to the FDA's investigation, the salmonella matched the strain detected in 2010, indicating the salmonella was a "resident" strain that had never been fully eradicated. The FDA had a conference call with Smucker representatives on May 19, 2022, and Jif instituted the recall on May 20, 2022.

At oral argument, Smucker's counsel countered that M.A. arrived at the hospital with constipation, which is inconsistent with salmonella. They say she had a history of constipation. They also state that M.A. and Cherie tested positive for COVID-19, which could explain gastrointestinal symptoms. They say that Farhad—a physician—had administered antibiotics to M.A. in the days before her hospitalization, and had also done so on previous occasions. According to counsel, 1.4 million people suffer salmonella infection every year. And the CDC only identified 21 cases linked to the outbreak that precipitated the recall (though they admit this may be an undercount). They add, though, that the Kentucky plant at issue produces 300 million pounds of peanut butter annually.

According to the parties at oral argument, the peanut butter at issue was manufactured on or about March 31, 2022. This was after repair of the air vent that—according to Smucker—was the source of the salmonella contamination that resulted in the recall.

[3] Plaintiffs allege that Jif's own testing revealed salmonella in finished, ready-to-eat peanut butter on October 20, 2021, December 25, 2021, and five dates in February 2022, the latest of which was February 21, 2022.

The Court notes that although no evidence of the parties' medical causation theories is now before the Court and the Court is now being asked to assess the merits of the parties' positions, the foregoing summary of some of the parties' theories provides context to their relevance arguments.

In this lawsuit, plaintiffs seek wrongful death and survival damages alleging Smucker's liability under the Louisiana Products Liability Act and in negligence and Walmart's liability in negligence and for breach of implied warranty of fitness. The trial was recently continued to June 2, 2025. The new deadline to complete discovery is March 6, 2025.

In their discovery motions, plaintiffs recount the months and months of delays they have experienced as Smucker promises supplementation, takes weeks or months to follow through and then, according to plaintiffs, makes a deficient supplementation. With the new trial deadlines in place, the Court's focus is on getting discovery on track. Following the supplemental production and conferences discussed during the hearing, the Court will hold a status conference with the parties to address remaining issues. Herein, the Court addresses plaintiffs' request that Smucker remove redaction of the peanut roasting temperature and processes from their production and that Smucker make the facility available for inspection.

## Law and Analysis

*1. Scope of Discovery*

The Federal Rules of Civil Procedure provide that "parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. Proc. 26(b)(1). "Information within this scope of discovery need not be admissible in evidence to be discoverable." Id. The Rule requires consideration of the following factors in assessing proportionality: "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties'

resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Id.

Prior to the 2000 amendments, the Federal Rules provided for discovery of nonprivileged matter "relevant to the subject matter involved in the pending actions." The 2000 amendments deleted the quoted language, limiting the scope of discovery to nonprivileged matters "relevant to the claim or defense of any party" and allowing for discovery "of any matter relevant to the subject matter involved in the action" only upon a showing of good cause. Fed. R. Civ. Proc. 26; see XTO Energy, Inc. v. ATD, LLC, No. CIV 14-1021 JB/SCY, 2016 WL 1730171, at *12–13 (D.N.M. Apr. 1, 2016) (analyzing the progressive rule changes); see also 8 Alan Wright, Arthur R. Miller, et al., Federal Practice and Procedure § 2008 (3d ed.). The change "signal[ed] to the court that it has the authority to confine discovery to the claims and defenses asserted in the pleadings, and signal[ed] to the parties that they have no entitlement to discovery to develop new claims or defenses that are not already identified in the pleadings." Fed. R. Civ. Proc. 26 advisory committee's notes to 2000 amendment. The committee explained that the parties should "focus on the actual claims and defenses involved in the action," but that a variety of types of information not directly pertinent to the incident in suit could be relevant to the claims or defenses raised in a given action." Id. Following the 2015 amendments to the Rules (which removed reference "to the subject matter involved in the action" entirely), courts have concluded that "[r]elevance is still to be 'construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on' any party's claim or defense.'" XTO Energy, Inc. v. ATD, LLC, No. CIV 14-1021 JB/SCY, 2016 WL 1730171, at *17 (D.N.M. Apr. 1, 2016) (quoting State Farm Mut. Auto. Ins. Co. v. Fayda, No. 14CIV9792WHPJCF, 2015 WL 7871037, at *2 (S.D.N.Y. Dec. 3, 2015), aff'd, No. 14CV9792, 2016 WL 4530890 (S.D.N.Y. Mar. 24, 2016)); Walker v. H & M

Henner & Mauritz, L.P., No. 16 CIV. 3818 (JLC), 2016 WL 4742334, at *2 (S.D.N.Y. Sept. 12, 2016).

While construing relevance broadly, this Court is anchored by the parties' pleadings. "To implement the rule that discovery must be relevant to the claim or defense of any party, district courts have examined the relationship of the requested discovery and the facts it is intended to uncover to the specific claims and defenses raised by the parties." Thibault v. BellSouth Telecommunications, Inc., No. CIV.A. 07-200, 2008 WL 4808893, at *2 (E.D. La. Oct. 30, 2008) (M.J. Wilkinson).

2. *Stipulation*

In a purported effort to reduce the discovery burdens in this case, Smucker proposes to stipulate as follows: "if plaintiffs are successful in proving that M.A. died from a salmonella infection, plaintiffs will not be required to also prove that M.A.'s salmonella infection was caused by Jif© peanut butter."[4] They cite a series of cases showing that a unilateral stipulation will limit discovery where the stipulation renders the discovery irrelevant.[5] But in contrast to the stipulation at issue here, the only cited cases where the court actually limited discovery involve a complete

[4] During the course of negotiations, Smucker's counsel indicated it would consider stipulating to liability if plaintiffs could prove that M.A. died from salmonella. But this proposal raises the same issues from plaintiffs' perspective as discussed below.

[5] In most of the cited cases, the stipulation did not limit discovery. In the first case cited by Smucker, the district judge actually reversed the magistrate judge's holding that found a stipulation that defendants commercially exploited the song at issue in a copyright infringement suit precluded discovery into the defendants' production and distribution of the song at issue, finding instead that this discovery was not covered by the stipulation. Landry v. Atl. Recording Corp., No. CIV A 04-2794, 2007 WL 1702619, at *1 (E.D. La. June 11, 2007). In the second, the court similarly found the stipulation did not render the discovery irrelevant. Dow Constr., LLC v. BPX Operating Co., No. 5:20-CV-00009, 2022 WL 1716511, at *5 (W.D. La. Apr. 29, 2022). And in Presley v. Columbia Gulf Transmission Co., the defendant stipulated that it was legally responsible for the payment of any legally recoverable damages proximately caused by the rupture of the pipeline at issue. No. CIV.A. 08-2020, 2009 WL 3805566, at *1 (W.D. La. Nov. 10, 2009). The plaintiffs sought discovery into the degree of defendant's knowledge of the condition of the section of the pipeline prior to the explosion. Id. at *2. The magistrate judge found the discovery into the defendant's culpability remained relevant to plaintiffs' claims for mental anguish. Id. at *1. The district judge affirmed. Id. at *2

stipulation of liability that is not contingent on the plaintiff proving something first. E.g., Senegal v. Anderson, No. CV 20-544-JWD-RLB, 2021 WL 4444722, at *1 (M.D. La. Sept. 28, 2021) (finding that defendants' stipulation that their employee's negligence was the sole cause of the motor vehicle accident and that the employee was in the course and scope of employment rendered the deposition of the employee and the defendant company irrelevant); Ferguson v. Swift Transportation Co. of Arizona, No. 17-CV-1570, 2020 WL 13158066, at *2 (W.D. La. Sept. 9, 2020), report and recommendation adopted, No. CV 17-1570, 2020 WL 13158071 (W.D. La. Oct. 5, 2020) (noting that the court had earlier precluded inquiry into the company's training, supervision, and entrustment of the employee driver where the company had already admitted its driver's negligence solely caused the accident and that it was vicariously liable for that fault).

Plaintiffs argue that the stipulation does not limit their needs for discovery regarding the source of salmonella because it does not establish that the peanut butter consumed was unreasonably dangerous under any of the applicable theories. Further, they argue that it is "written backwards." They argue the discovery they request is necessary to "bolster" the opinions of their experts. They seem to argue that their liability expert needs the discovery they have requested from Smucker to establish the probability that Smucker was selling salmonella-tainted peanut butter and their medical expert needs to rely on the liability expert's opinion to render an opinion on medical causation. Even worse, they submit that the stipulation will not prevent Smucker from presenting evidence to undermine the relevance of the recall and refute the probability that the peanut butter at issue was contaminated with salmonella. Yet without the requested discovery, plaintiffs will not be able to counter such evidence. Finally, plaintiffs argue that the stipulation would prevent them from "telling their story" and would prejudice their trial strategy. See Old Chief v. United States,

519 U.S. 172, (1997).[6] Plaintiffs say that to limit discovery to medical causation, Smucker must stipulate that "the cup of Jif peanut butter that M.A. consumed contained salmonella at the time it left J.M. Smucker's control and at the time it was consumed."[7]

Smucker argues that plaintiffs must first establish that the peanut butter consumed contained salmonella with direct evidence. They argue that no amount of discovery from Smucker will ever establish that the peanut butter M.A. consumed contained salmonella because the cup at issue as well as the other cups in the package were discarded before they could be tested for the presence of salmonella. They cite cases holding that evidence of a recall is irrelevant to show that a product was defective. E.g., Landry v. Adam, 282 So. 2d 590, 596 (La. Ct. App. 1973) ("As to proof that the injury occurred because of the product was defective at the time of the accident, the fact of a recall program is not relevant."); Brandner v. Abbott Labs., Inc., No. 10-3242, 2012 U.S. Dist. LEXIS 7017, at *25 (E.D. La. Jan. 23, 2012) ("The recall notice is far from an admission that every unit contained a redhibitory defect. . . . In order for a plaintiff to prevail in a redhibition action, the plaintiff must establish the existence of an actual defect at the time of sale."). The Landry case also stated that the plaintiff must prove the fact of a defect by direct evidence. 282 So. 2d at 596. And Smucker makes much of this in its opposition memorandum. But this is likely an overstatement by the Landry court, which cited no case law for its direct evidence requirement. As the United States Fifth Circuit has explained, not only may the defect under the LPLA be established by circumstantial evidence, but plaintiffs generally rely heavily on circumstantial

[6] In Old Chief, the Supreme Court discussed the importance of a criminal prosecutor being able to use evidence rather than stipulations to satisfy the jurors' expectation of what proper proof should be and to give life to the moral underpinnings of a finding of guilt, but held that where proof of convict status is at issue and the nature of the prior conviction is irrelevant, the defendant will usually be allowed to force the substitution of an admission for evidence. 518 U.S. at 191-92.

[7] They also propose three additional stipulations that would be required, but they seem to be cumulative in so far as having the effect of limiting discovery is concerned (e.g., that Smucker will not present evidence to disprove salmonella and that the peanut butter consumed was unreasonably dangerous both in construction and in lack of warning).

evidence. Roman v. W. Mfg., 691 F.3d 686, 698 (5th Cir. 2012); see Joseph v. Bohn Ford, Inc., 483 So. 2d 934, 940 (La. 1986) ("Plaintiff's burden of proving causation may be met by circumstantial evidence.").

The only stipulation on the table is contingent on the plaintiffs establishing medical causation. Yet plaintiffs argue that they need information about the likelihood of salmonella contamination to bolster or support their medical causation theory. As a result, the stipulation does not remove the need for discovery into that question. At this stage, the Court finds that discovery into whether the peanut butter at issue was contaminated cannot be foreclosed by Smucker's proposed stipulation. Whether the discovery proposed by plaintiffs is relevant to that or any other issue in this case, though, is a separate question.

*3. Roasting Temperature and Protocol*

Plaintiffs argue that Smucker should be required to remove all redactions to the roasting temperature and roasting process documents. They say that the roasting process serves as the primary "kill step" for harmful bacteria like salmonella. They reject Smucker's argument that the air vent issue was the source of the contamination that prompted the recall because, according to plaintiffs, the Lexington facility continued to experience positive test results and people across the country continued to get sick after the air vent issue was fixed.[8] Without further explanation, they say that the FDA "appears to disagree" with Smucker about the contamination source as well.[9] Plaintiffs insist the source of contamination is a contested issue. They say that the roasting temperature will give plaintiffs' expert insight into various safety related processes at the facility at the time the relevant batch of peanut butter was manufactured.

---

[8] Additionally, according to the Complaint, there was a positive test result at the facility in October 2021 before the air vent was installed.

[9] At oral argument, the parties disputed the content and meaning of the FDA related documents as to this question, with Smucker maintaining that the FDA agreed with the air vent source conclusion.

Smucker resists discovery of the roasting temperature and process because this information is highly guarded as a trade secret. They argue that competitors could not duplicate Jif's recipe without the roasting temperature. And they say that only an extremely limited number of Smucker employees have knowledge of this information (fewer than 20 individuals or less than .2% of the company). All employees are bound by a non-disclosure agreement and those with access to the roasting temperature must pass through user-account verifications, multi-factor authentication, strong passwords, and/or approval before accessing documents containing the roasting temperature. Smucker also relies on its stipulation to argue that information about the roasting temperature is irrelevant.

The Court finds the roasting temperature and roasting process information are irrelevant to the claims and defenses in this case. Plaintiffs' theory is that the peanut butter consumed by M.A. was contaminated with salmonella. Details of the roasting temperature and process will not bear on whether this is so. First, because the peanut butter cannot now be tested (and apparently neither it nor the lot it came from was ever tested), there will never be direct evidence showing it was contaminated. If plaintiffs hope to show that Smucker's standard roasting temperature and process are insufficient to kill salmonella such that most peanut butter—including that consumed by M.A.—produced at the Lexington facility is contaminated with salmonella, there is not one fact alleged or even argued that would support this theory. To the contrary, all known facts point to the opposite conclusion. If the temperature and process were insufficient to kill salmonella, then salmonella would be far more common in the supply of Jif peanut butter in the marketplace. Moreover, the FDA's investigations in 2022 (and 2010) would have revealed that the standard process was insufficient. If, instead, plaintiffs hope to show that something went wrong with the standard procedure in March 2022 when the lot at issue was produced, the standard roasting

temperature and process remain irrelevant. What would matter under that theory is what happened in March 2022. Plaintiffs have advanced no other theory of relevance for the Court to consider. Because the Court finds that there is no possibility the roasting temperature and process could bear on the claims or defenses in this case, this information is outside the scope of discovery.[10] Plaintiffs' Motion to Compel this information is DENIED.

*4. Inspection of Lexington Facility*

Plaintiffs also seek to compel an inspection of the Lexington manufacturing facility. They will agree to comply with safety and confidentiality protocols.[11] They argue that the inspection seeks information relevant to their claim that Smucker's improper design, maintenance, and operation of the facility led to repeated contamination incidents. They mention needing to discover the layout of the facility and its equipment, the overall cleanliness and hygiene of the facility and its equipment, the manufacturing processes and procedures actually implemented, the actual temperature and any difference from the temperature provided in the Smucker documents, and the methods used to collect environmental test samples and product test samples as well as location and frequency of testing. They add that the inspection will allow their expert to obtain photographs and video to use during trial and explain his opinions about the source of contamination. They say it would be unfair to preclude the inspection when Smucker has access to the facility and can use its familiarity with it to undermine the expert's credibility.

Smucker objects to the inspection, arguing first that the inspection is irrelevant in light of its stipulation. But they also argue that the inspection would be of limited relevance because it could not show whether there were any issues with the plant or Smucker's safety process prior to

[10] Of course, by refusing to disclose the roasting temperature and process information, defendants are also foreclosed from using such information at trial to, for example, show that the roasting temperature and process reduces the likelihood that the peanut butter at issue was tainted with salmonella.

[11] They point out that Smucker acknowledges that it allows other third parties to perform walk-throughs of the plant.

May 2022 when the peanut butter at issue was manufactured. Smucker submits that plaintiffs have information about the plant at the relevant time via the FDA documents and Smucker's response to the FDA documents. Smucker insists that discovery into whether Smucker is currently complying the safety protocols is irrelevant to the issues in this case. Smucker also submits that the proposed photographs and video raise confidentiality concerns.

In reply, plaintiffs say that Smucker has failed to explain how the safety processes and procedures now differ from those in place when the peanut butter at issue was manufactured. They say Smucker has not responded to interrogatories requesting information about the safety processes and procedures in place over the years. They insist the inspection cannot be precluded based merely on Smucker's assertion that unspecified processes have changed.

Although it may well be possible to institute sufficient safety and confidentiality protocols, the Court finds that inspection of the Lexington facility is irrelevant. The current layout of the facility and its equipment, the current cleanliness, the current actual manufacturing processes and procedures, the current actual temperatures, the current methods of collection, and the current frequency and location of testing do not bear on the layout, cleanliness, processes, temperatures, and testing methods, frequency, and location at the time the peanut butter at issue was manufactured. And only that peanut butter and that time period is relevant to the claims and defenses in this case. As a result, there is no benefit to be gained from allowing the inspection to proceed. To the contrary, it will impose a great burden on Smucker to make the facility available for inspection, with the protocols that will have to be put into place to maintain safety, cleanliness, and confidentiality and the time the facility and its staff will have to divert to the inspection. The

proposed inspection is neither relevant nor proportional to the needs of the case.[12] Accordingly, plaintiffs' Motion to Compel the inspection is DENIED.

Conclusion

Because the peanut roasting temperatures and processes are irrelevant to the claims and defenses, plaintiffs' Motion to Compel this information, as raised in their Motion to Compel Various Discovery (Rec. Doc. 84), is DENIED. Similarly, inspection of the facility that manufactured the allegedly tainted peanut butter could not yield any relevant information and plaintiffs' Motion to Compel Inspection (Rec. Doc. 87) is DENIED. These motions have now been resolved.[13]

New Orleans, Louisiana, this 23rd day of September, 2024.

Janis van Meerveld
United States Magistrate Judge

[12] Of course, by resisting the inspection, Smucker is foreclosed from using any information about the *current* cleanliness, processes, temperatures, methods of collection, and testing methods, frequency of collection (including any current photographs or videos) in its defense.
[13] As noted above, the court will address the Motion to Compel Depositions (Rec. Doc. 111) at or following the forthcoming status conference.